FILED US District Court-UT
DEC 09 '24 PM 12:30

**DAVID J. HOLDSWORTH (4052)**
9125 South Monroe Plaza Way, Suite C
Sandy, UT  84070
Telephone (801) 352-7701
Facsimile (801) 567-9960
david_holdsworth@hotmail.com
*Attorney for Plaintiff*

IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | | |
|---|---|---|
| MOHAMED F. EL-HEWIE, | : | **COMPLAINT** |
| | : | **((JURY TRIAL DEMANDED)** |
| Plaintiff, | : | |
| | : | |
| v. | : | Case: 2:24-cv-00910 |
| | : | Assigned To : Stewart, Ted |
| WALMART ASSOCIATES, INC., | : | Assign. Date : 12/09/2024 |
| | : | Description: El-Hewie v. Walmart Associates |
| Defendant. | : | Hon. |

COMES NOW the Plaintiff, Mohamed F. El-Hewie, complains of

Defendant Walmart Associates, Inc., demands trial by jury and as and for causes of

action alleges as follows:

**PARTIES**

1.     Mohamed F. El-Hewis is a citizen of the United States and, at all

times relevant hereto, was a resident of the State of Utah.

2.     Walmart Associates, Inc., is an "employer" within the meaning of

Title VII which does business in the State of Utah.  On information and belief, Plaintiff

alleges that, at all times relevant hereto, Walmart Associates, Inc. (hereinafter "Defendant"), was an "employer" within the meaning of Title VII of the Civil Rights Act of 1964, as amended, and the Americans with Disabilities Act, as amended, which did business in the State of Utah, and which employed 15 or more employees, including Plaintiff.

**JURISDICTION**

3.     This action is brought pursuant to Title VII of the Civil Rights Act of 1964, as amended, and the Americans with Disabilities Act of 1990, as amended, for discrimination in employment and for retaliation. Jurisdiction is specifically conferred on this Court by 42 U.S.C. § 2000 e (5). *and the ADA.* Equitable and other relief are also sought under 42 U.S.C. § 2000 e (5) (g). Jurisdiction is also based on 28 U.S.C. §§ 1331, 1332 and 42 U.S.C. § 1981, et. seq.

**VENUE**

4.     This Court has jurisdiction over the instant case pursuant to federal question — namely, the interpretation and application of Title VII of the Civil Rights Act of 1964 ("Title VII"), as amended, and the Americans with Disabilities Act of 1990 ("ADA"), as amended, which provides that it is unlawful to discriminate against an employee in his employment on the basis of his disability, and to retaliate against an employee for engaging in protected activity.

2

5.    Venue in this Court is proper in that the employment practices alleged herein to be violative of Title VII and the ADA were committed within the jurisdiction of the State of Utah.

**EXHAUSTION OF ADMINISTRATIVE REMEDIES**

6.    On or about _2/25/22_, Plaintiff filed a Charge of Discrimination with the Utah Labor Commission's Antidiscrimination and Labor Division ("UALD") in which he alleged that Defendant had discriminated against him based on disability, and had retaliated against him for engaging in protected activity.

7.    Plaintiff filed his Charge of Discrimination within 180 days from the last date of the alleged harm.  Plaintiff alleges all jurisdictional requirements have been met, as required by Title VII of the Civil Rights Act of 1964, as amended, and the Americans with Disabilities Act of 1990, as amended.

8.    On or about September 11, 2024, the Equal Employment Opportunity Commission ("EEOC") issued Plaintiff a Notice of Right to Sue.

9.    Thus, all jurisdictional requirements have been met as required by Title VII and the ADA.

**STATEMENT OF FACTS**

10.    Plaintiff incorporates by this reference all allegations listed in paragraphs 1 through _9_ above as if alleged in full herein.

11.    Plaintiff alleges that, on August 19, 2019, Defendant hired Plaintiff to work as a driver based out of Distribution Center #7026, located in Grantsville, UT.

12.    Plaintiff alleges he is of the Middle Eastern Arabic race and from Egypt.

13.    Plaintiff alleges he is a practicing Muslim.

14.    Plaintiff alleges that, at all times relevant hereto, he was well over 40 years of age.

15.    Plaintiff also alleges he is a person with a disability in that, due to a work-related injury, he has an impairment which substantially limited several of his major life activities.

16.    During his employment with Defendant, Plaintiff interfaced with several managers and supervisors, including Jared Harrison ("Harrison"), General Transportation Manager, and Kevin Baker ("Baker"), Transportation Safety Manager.

17.    Plaintiff alleges that, during his employment, as an over-the-road driver, he had the job of safely driving a tractor-trailer to transport and deliver goods to appropriate destinations in a timely manner. Plaintiff had some limited autonomy to decide when to depart with a load, when to stop driving for safety reasons, how to use

4

his time, and when to work, among other considerations, but that he was expected to communicate regularly regarding his workload and schedule.

18.     Plaintiff acknowledges Defendant maintains a Performance Tracking Policy ("PTP") to assist associates (a.k.a. employees) to improve their behavior and job performance to meet Defendant's expectations, and to ensure consistent application of employer policies when addressing performance issues. Defendant's PTP uses "occurrences", which are a written record of verbal discussions with an associate to correct behavior or performance, and "steps", which are a higher level of discipline requiring a verbal discussion with the associate to correct behavior or performance.  Defendant records occurrences and steps in an associate's Performance Tracking Log ("PTL").  Before issuing an occurrence or a step on an associate's PTL, the appropriate manager is supposed to conduct an investigation; the outcome of the investigation will usually determine the appropriate action to take. Additionally, the human resource manager ("HRM") and general transportation manager ("GTM") must review all steps before issuing a step to an associate.  If an associate receives four "steps", then Defendant usually will terminate that associate's employment.

19.     Defendant's PTP states that multiple issues occurring at the same time are to be addressed as a single step.  Further, Defendant's PTP splits steps into

5

two categories, Section A and Section B.  Steps under Section A remain on an associate's PTL for 12 months, and steps under Section B remain on an associate's PTL for six months.  If an associate has no further recurrence of behavior or performance problems for 12 months in Section A, or six months in Section B, the steps are marked as "inactive" and returned to the associate's personnel file.  Defendant treats Section A and Section B steps independently of each other, until a Step 3 is received in either section.  Defendant allows for only one Step 3, and any further additional step, whether under Section A or Section B, will usually result in a Step 4 and termination of employment.

20.     Defendant's step system in the PTP states that a Step 1 will result in a manager meeting with the driver privately, with the goal to point out the driver's involvement in a problem and come to an agreement to resolve the problem.  A Step 2 will result in two managers meeting privately with the driver to discuss a problem and work toward a resolution, and the managers will make a written record summarizing the discussion.  A Step 3 will result in a private meeting with the driver and two managers, and the GTM or HRM may get involved to approve any Step 3 before discussing it with the driver.  A Step 4 will usually result in termination, but before meeting with the driver, the appropriate regional management team will review the

termination and the appropriate supporting documents. A termination based on a Step 4 must have the Regional Transportation Manager's approval.

21.     On information and belief, Plaintiff alleges that, soon after Defendant hired him, it began giving him occurrences and steps for situations and incidents for which it did not discipline Caucasian, American born, Christian, younger, and/or non-disabled employees.

22.     Plaintiff alleges that Harrison labored hard for two years to generate a paper trail of occurrences and steps against him which he could use as a reason to terminate his employment.

23.     On October 18, 2019, Defendant issued Plaintiff a performance tracking occurrence for alleged driver log violations.

24.     On November 9, 2019, Defendant asserted Plaintiff supposedly pulled his tractor away from a distribution center's fuel island without removing the fuel nozzle. Defendant asserted this resulted in damage to the fueling equipment, amounting to a $200 repair, and it issued a performance tracking occurrence to Plaintiff.

25.     On May 13, 2020, Defendant issued Plaintiff another performance tracking occurrence for alleged driver log violations.

26.    On June 22, 2020, Defendant issued Plaintiff a performance tracking occurrence due to an alleged dress code violation for wearing pajamas to work. Plaintiff denies this and states that he does not have pajamas. Plaintiff alleges that he was on a trip and was wearing his latrine gear as he was going to shower that morning, but was unable to shower.

27.    On June 24, 2020, Defendant asserted that Plaintiff supposedly failed to communicate his estimated time of departure ("ETD") to Defendant and Defendant issued another performance tracking occurrence to Plaintiff.

28.    On September 10, 2020, and December 28, 2020, Defendant asserted that Plaintiff supposedly failed to communicate his ETD again and it issued performance tracking occurrences to Plaintiff.

29.    On December 29, 2020, Defendant issued Plaintiff a performance tracking occurrence for supposedly taking extra time for layovers and breaks, as well as taking unnecessary breaks resulting in late deliveries.

30.    Plaintiff alleges that, on January 23, 2021 he was on a delivery in Colorado during a snowstorm. Plaintiff alleges that there were six-foot-tall snowbanks on the roads, and the wind was blowing, reducing his visibility. Plaintiff alleges that, when he left Colorado in the morning, he hit a snowbank with his fender. Plaintiff alleges that, when he arrived in Idaho Falls, later that day, he got out to look at his

truck and noticed a crack on the bottom of the right fender. Plaintiff alleges that, due to his being an engineer, he could tell what the damage was caused by, and that it was a small crack. Plaintiff alleges that, upon finding the damage, he temporarily fixed the damage with epoxy, cleaned it up, and that it "looked good". Plaintiff alleges that, when he returned from his trip, Baker saw the crack and reported to Harrison that Plaintiff had not reported the damage to the fender.

31.     Thus, on January 23, 2021, Defendant asserted that Plaintiff failed to report a preventable accident that he caused and that he attempted to repair the damage himself in order to conceal the damage.

32.     Defendant asserted that a failure to report any accident, no matter how insignificant, violated its policies and procedures. Defendant asserted that Plaintiff's attempt to conceal the damage by attempting to repair it himself, without reporting it to Defendant, was unacceptable, lacked integrity, and violated Defendant's expectations. Defendant asserts that it explained to Plaintiff that he was required to report all such incidents, regardless of whether he believed he could repair the damage himself. Defendant asserts that this incident resulted in Plaintiff's Step 1, in Section 8 of Defendant's PDP.

33.     Plaintiff alleges that, on February 2, 2021, he received a phone call on his day off to come in and meet with Baker and Harrison. Plaintiff alleges that

9

he asked why they wanted to meet with him, and that he was told that his truck had substantial damage (allegedly from the January 23, 2021 incident) which needed to be investigated. Plaintiff alleges that he was then put on a paid "hold" (suspension from driving) for two days to allow Defendant to investigate the situation. Plaintiff alleges that Baker asked Plaintiff why he did not report the damage, and that he responded, "having a crack in the fender is like having a cracked windshield, it didn't bother me and it is not illegal to drive the truck with a cracked fender". Plaintiff alleges that Baker gave Plaintiff two steps for the accident, one for the accident and one for failing to report it, which is against Defendant's PDP. Plaintiff alleges that Harrison "sided with" Baker and accused Plaintiff of being dishonest for failing to report the damage to the front plastic bumper of the truck and instructed Plaintiff to avoid doing any self help work on the truck in the future.

34.     On February 20, 2021, Plaintiff allegedly mistakenly filled his truck's fuel tank with Diesel Exhaust Fluid ("DEF"). Defendant asserted that this required the tractor to be towed to a vendor to have the tank and system flushed, which cost approximately $13,000 to fix. As a result, Defendant issued Plaintiff a Step 2 in Section A, of Defendant's PDP.

35.     Plaintiff alleges that, on March 18, 2021, he hooked up to a trailer to move the trailer, which, at the time, he did not know had two store associates who

were inside of the trailer unloading products.  Plaintiff alleges that he did move the trailer, which startled the associates inside.  Plaintiff alleges that  nobody was hurt when he did this.  Plaintiff alleges that Defendant has an unsafe practice by not having a system that informs drivers when trailers are being unloaded or when doors are open. Plaintiff alleges that several other drivers have been disciplined due to the same issue. Plaintiff alleges that Defendant failed to remedy the issue following past similar incidents, and that he should not be responsible for a problem Defendant did not fix. Plaintiff also alleges that Defendant has had associates in the past be injured, paralyzed, or killed by a drastic accident of hooking, impacting, or pulling away a trailer loaded with associates.  Plaintiff alleges that the same serious safety violation which caused his March 18, 2021 incident was the cause of the previous accidents, and that Defendant had failed to remedy the serious safety issue.  Plaintiff alleges that Defendant asserting this incident was his fault was discriminatory.

36.     Plaintiff alleges that, on March 19, 2021, he met with Harrison and Baker to discuss the March 18, 2021 incident.  Plaintiff alleges that Baker entered the meeting late, and while Harrison was speaking, Baker started "shouting in a hostile and violent manner, directing his anger towards [Plaintiff], waiving his hands, frowning, and yelling in an uncontrolled manner".

37.    Plaintiff alleges that Defendant issued Plaintiff a single Step for the single incident occurring on March 18, 2021, however, it then placed Plaintiff on Step 3 in Section A of Defendant's PDP.

38.    On or about April 3, 2021, Defendant asserted that Plaintiff exceeded his 14-hour-limit by 53 minutes and 59 seconds.  On April 3, 2021, Defendant issued a performance tracking occurrence to Plaintiff for DOT Log Violations.

39.    Plaintiff alleges that, on April 4, 2021, he filed a "Complaint of Harassment and Targeted Discrimination in Workplace" with Defendant's Global Ethics Office.  The complaint mentions "Incidents of habitual insensitive threats by [Harrison]," referencing the January 23, 2021 issue of Plaintiff not reporting minor damage to the front plastic bumper of his truck.

40.    Plaintiff alleges that, in his April 4, 2021, complaint, he alleged Harrison described Plaintiff as being dishonest for fixing a plastic tear with epoxy, and that Harrison exhibited "condescending and unethical conduct" by accusing truck drivers of being "reckless, uneducable, and unfit to do their jobs".  Plaintiff's complaint also alleges an "Incident of Violent, Hostile, and Belligerent Confrontation" by Baker, referring to Baker's behavior during the March 19, 2021 meeting Plaintiff had with Harrison and Baker in which Baker started "shouting in a hostile and violent

12

manner, directing his anger towards [Plaintiff], waiving his hands, frowning, and yelling in an uncontrolled manner". Plaintiff alleges that, when he failed to respond to "the angry and belligerent attitude" of Baker, Plaintiff looked to Harrison and asked repeatedly: "Am I supposed to be yelled and shouted at in your office?", "Am I supposed to be insulted at work?", And "Am I supposed to be treated in [such] a hostile manner?"

41.    Plaintiff alleges that Baker continued to shout, and that Harrison and Plaintiff were stunned into silence by such an acute episode of anger from Baker. Plaintiff alleges that he attempted to "calm [the situation] down and avoid any hint that might be wrongfully interpreted by Baker, and that might turn into real physical violence".

42.    Plaintiff also complained to Defendant's Global Ethics Office about Baker asking him to "stop talking" during the March 19, 2021 meeting.

43.    Plaintiff alleges that he also filed his April 4, 2021 complaint to specifically address the serious workplace safety concern of unmarked, unrestrained trailers with associates working inside the trailers. In his complaint, Plaintiff alleged that drivers have accused Defendant of being unprofessional, and have repeatedly suggested that Defendant's loading docks pose a risk because workers enter trailers without warnings to drivers and that the trailers are being used during hook and drop

operations, and without safety signs that alert drivers of any activity inside trailers. Plaintiff alleges that Harrison's suggestion that "drivers were at fault because of failing to communicate" disregards the fact that drivers worked all hours of the day, have busy routines and variable experiences. Plaintiff alleges that Harrison's claim that mentors have addressed all issues that drivers need to know about is unrealistic due to issues being too numerous to be addressed. Plaintiff also alleges that Harrison accused professional drivers, like himself who make mistakes, of being "unfit" and "overwhelmed" by the job. Plaintiff alleges that Harrison also engaged in a cover-up by failing to convey drivers' concerns about major safety issues to his superiors.

44.    On April 8, 2021, Defendant issued Plaintiff a performance tracking occurrence for allegedly missing his 1300 ETD and not communicating to the office that he would be late.

45.    On July 19, 2021, Defendant hired Nicholas Trujillo ("Trujillo") to work as Defendant's new Transportation Safety Manager.

46.    Plaintiff alleges that, on November 8, 2021, he messaged Trujillo with pictures of ruptured air hoses on his tractor. Thereafter, he was assigned a temporary tractor.

47.     On November 9, 2021, Defendant issued Plaintiff a performance tracking occurrence for allegedly failing to communicate that he would not have a temporary tractor back by the assigned return date.

48.     On December 9, 2021, Plaintiff was on a delivery and was late leaving the distribution center and did not update his estimated departure time. Defendant asserted that, due to Plaintiff leaving the distribution center late and not updating his departure time, at 6:55 a.m., Teresa Wali ("Wali"), Operations Manager, left Plaintiff a message regarding Plaintiff's delivery. The message states: "I sent you a message but looks like you're supposed to come off of layover at about 5 o'clock. It's now seven. I'm wondering where you're at trying to get this load on the road". Wali ended the message by stating, "we really need to get you out of here as soon as possible. If you can call me back at the transportation office".

49.     Plaintiffs alleges that, on December 10, 2021, he called Wali back, and Wali stated the trailer should have left the distribution center yard after Plaintiff's layover ended at 0500 (a.m.). Plaintiff responded that the gate time was 10:30 a.m. and that the weather conditions did not permit early departure. Wali then insisted that, if Plaintiff did not leave soon, she would give the load to another driver. Plaintiff alleges he requested to speak to Wali's supervisor, because her demands were irrational due to the weather conditions. Plaintiff alleges that Wali responded she was the manager and,

if Plaintiff did not "gate out soon", that she would give the load to another driver. Plaintiff alleges he "gated out" at 07:30 a.m., after which the gate personnel instructed him that the I-80 westbound freeway was closed and that drivers who had left early were returning to the distribution center.

50.    Because of Plaintiff's interactions with Wali, Plaintiff reported to Harrison, as well as Mandy Hill ("Hill"), another Transportation Operations Manager, that Wali was "harassing" him.

51.    Plaintiff alleges that, on December 13, 2021, he filed a complaint with Defendant regarding harassment and safety concerns against Wali. In his complaint, Plaintiff alleged that Wali should have been and was aware that the wind and snowstorm on December 9, 2021 had caused major delays on I-80 between Colorado and Utah.

52.    Further, in his complaint, Plaintiff alleged that Wali would not have been able to find another driver to perform the delivery due to roads being closed from December 9 through December 13, 2021. Plaintiff attached photos to his complaint, showing that, on December 10, 2021, I-80 eastbound was closed from Cheyenne to Rawlins, Wyoming, a road sign stating the freeway is "closed to all light high-profile vehicles" due to wind gusts of 70+ miles per hour, and several photos of semi-trucks stopped on the freeway. Plaintiff also attached photos from December 11,

2021, showing several semi-trucks stopped on the side of the freeway due to weather conditions. Plaintiff alleges that I-80 was closed, and that Wali was well aware of this fact. Plaintiff alleges that, due to Wali knowing the situation, that her voicemail and following conversation with Plaintiff were discriminatory, and that she acted with total disregard to Defendant's code of conduct.

53.    Plaintiff acknowledges that, on December 16, 2021, he had an accident while moving around several trailers. Plaintiff alleges that he moved one trailer to the gate, then was asked to also move a second trailer, which he did. Plaintiff alleges that he then went to move his original trailer, and while backing in, his cord ruptured and got caught in the wheels of the tractor. Plaintiff alleges that he was diligent and inspected every trailer before he moved them, and that he properly inserted the airline hose/cord when backing in his trailer, but that it came disconnected in the process.

54.    Plaintiff told Trujillo that, "because of the sharp turn and angle of the trailer in relation to the tractor, it caused the air and light cords to stretch and pull away from the glad hand connectors".

55.    Plaintiff alleges Defendant deemed this incident as Plaintiff causing a preventable accident that resulted in the pulling of airline hoses from the glad hand connectors. Defendant asserts the light court connector to the trailer fell between

the tractor drive duals and wrapped around the tires. Defendant asserts that this accident resulted in a delivery being delayed and late, and it issued a Step 4 to Plaintiff.

56.     Plaintiff alleges that Defendant falsely described Plaintiff's December 16, 2021 accident by relying on "the false statement" of Trujillo, an "inexperienced, untrained, and uneducated "Safety Manager". Plaintiff alleges that Trujillo "speculated that he could investigate, assess, and terminate a professional truck driver without the slightest knowledge or experience or education in commercial transportation". Plaintiff alleges that Trujillo ignored the scenario of moving, hooking, and dropping three trailers in a matter of 35 minutes on December 16, 2021. Plaintiff alleges that he is a professional truck driver, licensed by the State of Utah, and has successfully completed seven-and-half years of commercial truck driving without a single incident, while Trujillo lacks any professional trucking experience or licensing or training. Plaintiff alleges that the "false belief" of Trujillo, that the light cords must be connected while backing up in close quarters in a parking lot of a store, stems from his lack of experience.

57.     Plaintiff further alleges that Trujillo was hired, interviewed, and coached by Harrison, and, thus, was coerced to interpret the facts in such a way as to appease Harrison. Plaintiff alleges that Trujillo was informed by Plaintiff in October and November 2021, that some of Defendant's tractors have long and singly suspended

air hoses that pose safety risks.  Plaintiff alleges that, because of Trujillo's lack of experience, training, or knowledge of commercial transportation, he disregarded Plaintiff's warnings and blamed Plaintiff for the December 16, 2021 accident.

58.    Plaintiff alleges that, on December 22, 2021, Defendant called him into a meeting with Harrison and Defendant terminated his employment.  Plaintiff alleges that Defendant told him that the termination was due to him reaching his fourth step in the PDP.  Plaintiff alleges that he responded that he did not have four steps. Plaintiff alleges that Defendant wanted him to sign the termination paper and that he did not sign it.

59.    Plaintiff alleges that Baker had discriminated against him in his termination due to Baker giving him three of his four steps.

60.    Plaintiff also alleges that Defendant has erred in concluding that a licensed commercial truck driver could be evaluated, mentored, disciplined, or terminated by inexperienced, unlicensed, uneducated, salaried GTMs or safety managers.  Plaintiff alleges that, based on the disparity in experience, knowledge, and training, commercial truck drivers should only be evaluated by federally authorized, trained, and scrutinized officers.

61.    Plaintiff alleges that, due to Defendant having knowledge of his race, national origin, religion, and age, Defendant discriminated against him in his employment and in the matter of his termination.

62.    Plaintiff alleges that Defendant and its agents all had direct knowledge of Plaintiff's foreign accent and uncommon name.  Plaintiff alleges that the operation manager at one of Defendant's other locations inquired whether Plaintiff takes breaks on Friday afternoons due to the Islamic obligation of prayer.  Plaintiff alleges this operation manager appeared to be informed by someone that Muslims must pray in mosques every Friday afternoon.

63.    Plaintiff alleges that Defendant is attempting to cover up discrimination based on Plaintiff's race, national origin, religion, and age, and also retaliation, by referring to Defendant's PDP, when, in fact, discrimination occurred by individuals with direct knowledge of Plaintiff's protected characteristics.

64.    On information and belief, Plaintiff alleges that he received two steps for the single January 23, 2021 incident, and points to Defendant's "performance report", which states that two steps were issued on that date, as evidence of discrimination.  Defendant's PDP states that a driver could not receive two steps for a single incident.

65.     Plaintiff also alleges that Defendant retaliated against him when Defendant terminated his employment.  Plaintiff alleges that his April 4, 2021 complaint against Harrison and Baker, and his December 13, 2021 complaint against Wali, both address discriminatory attitudes and ignoring safety concerns by the three managers.  Plaintiff alleges that, instead of responding to his complaints, Harrison terminated him under the pretext of reaching his fourth step in the progressive discipline policy.  Further, Plaintiff alleges that "no common carrier employer would ever terminate a professional C.D.L. driver for [a] torn fiberglass bumper, ruptured air lines, or hooking by mistake to a trailer without injury".

## CAUSES OF ACTION

## FIRST CAUSE OF ACTION
## DISCRIMINATION ON THE BASIS OF RACE, NATIONAL ORIGIN, RELIGION, AND AGE

66.     Plaintiff incorporates by this reference all allegations listed in paragraphs 1 through 65 above as if alleged in full herein.

67.     To state a prima facie case of discrimination based on race, national origin, religion, and/or age, Plaintiff alleges facts which establish, or tend to establish, that: (1) he is a member of a protected class; (2) he was qualified for the position he held; (3) Defendant subjected him to an adverse employment action; and

(4) the circumstances surrounding the adverse action give rise to an inference of discrimination. *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802 (1973).

68.    Plaintiff alleges he is of the Arabic race, is from Egypt and is Muslim and is over the age of 40. Plaintiff alleges he was qualified for the position he held.

69.    As such, Plaintiff's allegations satisfy the first two elements of a prima facie case of disparate and adverse treatment.

70.    Plaintiff alleges Defendant took adverse action against him. An adverse employment action includes "significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits". *Piercy v. Maketa,* 480 F.3d 1192, 1203 (10th Cir. 2007).

71.    Defendant terminated Plaintiff from his employment. Termination of employment is an adverse action.

72.    As such, Plaintiff's allegations satisfy the third element of a prima facie case of disparate and adverse treatment.

73.    Plaintiff alleges that the circumstances surrounding the adverse action give rise to an inference of discrimination. Potential circumstances that give rise to an inference of discrimination are: (1) disparate treatment, which, but for the

employee's protected trait, would be different, *International Union v. Johnson Controls, Inc.,* 499 U.S. 187, 200 (1991)l and (2) evidence that the protected trait actually motivated the employer's decision. *Phillips v. Martin Marietta Corp.,* 400 U.S. 542, 544 (1971).

74.     Plaintiff alleges that Defendant treated him differently, less favorably, and more harshly than Caucasian, American born, Christian and younger employees. Plaintiff alleges that Defendant terminated his employment because of his race, national origin, religion and/or age.

75.     Plaintiff alleges that his race, national origin, religion, and/or age actually motivated Defendant's decision to terminate him.

76.     Plaintiff alleges that Defendant's explanation that Plaintiff reached his last step in the progressive discipline process was discriminatory, and that he was not at fault for some of the incidents resulting in his steps.

77.     As such, Plaintiff's allegations provide a sufficient basis to support an inference of discrimination.

78.     As such, Plaintiff's allegations satisfy the fourth element in a prima facie case of disparate and adverse treatment.

**SECOND CAUSE OF ACTION**
**DISCRIMINATION ON THE BASIS OF DISABILITY**

79.    Plaintiff incorporates by this reference all allegations listed in paragraphs 1 through 78 above as if alleged in full herein.

80.    To state a prima facie case of discrimination based on disability, Plaintiff alleges facts which establish, or tend to establish, that: (1) he is a member of a protected class; (2) he was qualified for the position he held; (3) Plaintiff requested a reasonable accommodation; and (4) Defendant refused or failed to afford Plaintiff a reasonable accommodation.

81.    The ADA states a disability is "(A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment". 42 U.S.C. § 12102 (2).

82.    As such, Plaintiff's allegations satisfy the first two elements of a charge of disparate treatment based on his disability or religion.

83.    Plaintiff alleges he is a person with a disability in that he has an impairment — a work-related right thumb, wrist and arm injury, and an overcompensation left hand, wrist and arm injury, that substantially limit several of his major life activities, including performing manual tasks and working.

84.    Plaintiff alleges he was otherwise qualified for the position he held or desired in that he could perform the essential functions of his job with a reasonable accommodation.

85.    Plaintiff alleges he requested plausibly reasonable accommodations for his impairment, including installing motorized or automated cranking of the landing gear on his trailer.

86.    Plaintiff alleges Defendant refused or failed to grant his requests to accommodate his impairment.

87.    Plaintiff's allegations satisfy the elements of a prima facie case of discrimination on the basis of disability in the form of a failure to accommodate.

88.    Furthermore, Plaintiff alleges Defendant terminated his employment because of his disability in that, among other things, it terminated his employment very soon after he asserted a work-related injury and requested reasonable accommodations.

### THIRD CAUSE OF ACTION
### DEFENDANT SUBJECTED PLAINTIFF TO RETALIATION

89.    Plaintiff incorporates by this reference all allegations listed in paragraphs 1 through 88 above as if alleged in full herein.

90.    To state a prima facie case of retaliation, Plaintiff alleges facts which establish, or tend to establish, that: (1) he engaged in protected opposition to

25

discrimination; (2) a reasonable employee would have found the challenged action materially adverse; and (3) causal connection existed between the protected activity and the materially adverse action. *Argo v. Blue Cross and Blue Shield of Kansas, Inc.,* 452 F.3d 1193, 1202 (10th Cir. 2006).

91.    Plaintiff alleges that he engaged in protected opposition to discrimination in several ways and on several occasions. A protected activity is one in which the individual has participated in a charge of discrimination under the relevant Act or opposed a practice prohibited by the Act. "Although no magic words are required, to qualify as protected opposition, the employee must convey to the employer his or her concern that the employer has engaged in a practice made unlawful by [anti-discrimination statutes]." *Hinds v. Sprint/United Management Co.,* 523 F.3d 1187, 1203 (10th Cir. 2008).

92.    Plaintiff alleges he engaged in protected activity on: (1) April 4, 2021, when he complained of Baker's harassing behavior; and (2) December 13, 2021, when he filed a complaint against Wali.

93.    Plaintiff's April 4, 2021 "Complaint of Harassment and Targeted Discrimination in Workplace" mentions Baker's "violent, hostile, and belligerent" confrontation and Harrison's "incidents of habitual and sensitive threats". By so

doing, Plaintiff implied that the behavior he was complaining of was discriminatory based on his race, national origin, religion and age.

94.     As such, Plaintiff's allegations satisfy the first element of a prima facie case of retaliation regarding the April 4, 2021 complaint.

95.     Plaintiff alleges he also engaged in protected activity on December 13, 2021, when he filed a complaint against Wali. In this complaint, Plaintiff alleges that Wali "harassed him" by contacting him early in the morning and waking him up, and that her suggestion that he should leave the distribution center immediately would have put him at extreme risk due to weather conditions. Plaintiff implied that Wali's alleged behavior was discriminatory or harassing based on his race, national origin, religion, and age.

96.     Plaintiff's allegations satisfy the first element (that he engaged in protected activity).

97.     Plaintiff alleges that, thereafter, Defendant subjected him to an adverse action. An adverse employment action includes "significant change in employment status, such as hiring, firing, failure to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits". *Piercy v. Maketa,* 480 F.3d 1192, 1203 (10th Cir. 2007).

98.    Defendant terminated Plaintiff from his employment.  Termination of employment is an adverse action.

99.    As such, Plaintiff's allegations satisfy the second element of a prima facie case of retaliation.

100.    Plaintiff alleges a causal connection exists between his engaging in protected activity and the adverse action that Defendant took against him based on temporal proximity and Harrison's and Baker's hostility towards him, including his protected characteristics.

**FOURTH CAUSE OF ACTION**
**WRONGFUL TERMINATION**
**(Retaliation for engaging in a whistleblowing under the Surface Transportation Assistance Act, 49 U.S.C. § 31105 and its implementing regulations at 29 C.F.R. § Part 1978)**

101.    Plaintiff incorporates by this reference all allegations listed in paragraphs 1 through ___ above as if alleged in full herein.

102.    Plaintiff alleges that, on December 22, 2021, he filed an administrative complaint with the U.S. Department of Labor's Occupational Safety & Health Administration.  Said complaint was filed, or eventually lodged, with the U.S. Department of Labor, Office of Administrative Law Judges.

103.    In the STAA, Congress established jurisdiction in the district courts to adjudicate de novo any claim                              as to which the Secretary of

Labor has not issued a final determination within 210 days of the filing of the claim. *See* U.S.C. § 31105 (c).

104.    As of February 20, 2023, the Secretary of Labor had not issued a final determination and, accordingly, Plaintiff filed a motion for dismissal without prejudice of his STAA complaint pending in the Office of Administrative Law Judges so that he could file the same in U.S. District Court when he received a right to sue letter allowing him to file a related employment discrimination case in U.S. District Court.

105.    **Insert U.S. District Court Complaint from April 23, 2023 email from El-Hewie (anything older than a year has been deleted (do you have a copy of it?)**

## IV. DAMAGES

106.    Plaintiff alleges Defendant's actions and inactions have caused him various losses, injuries and other damages, including lost wages, lost benefits, longer trips in subsequent employment, more strenuous work in subsequent employment, financial hardship and stress, and emotional distress.

## V. RELIEF REQUESTED

Accordingly, based on the above allegations, claims and damages, Plaintiff requests the following relief, specifically an Order and Judgment:

1.   Declaring that Defendant discriminated against Mr. El-Hewie on the basis of his gender, race, national origin, religion, and disability, and retaliated against him, in violation of the Title VII of the Civil Rights Act, and the ADA;

2.   Awarding Mr. El-Hewie "make whole" relief, by awarding Mr. El-Hewie the value of his lost wages and the value of his lost benefits from the time Defendant terminated Mr. El-Hewie's employment until Mr. El-Hewie secures comparable employment, or for a period of two years, whichever occurs first;

3.   Awarding Mr. El-Hewie his reasonable attorney's fees and costs;

4.   Awarding Mr. El-Hewie such other relief as may be just and equitable.

DATED this 7 day of December, 2024.

/s/ David J. Holdsworth

David J. Holdsworth
*Attorney for Plaintiff*